**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ACE AMERICAN INSURANCE CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:20-CV-01347-JAR |
| | ) | |
| AERCO INTERNATIONAL, INC., and | ) | |
| BLACKMORE AND GLUNT, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant AERCO International, Inc.'s ("AERCO") Motion for Judgment on the Pleadings. (Doc. 16). The motion is fully briefed and ready for disposition. For the reasons discussed below, the motion will be granted in part.

## I.    BACKGROUND

Plaintiff ACE American Insurance Company ("ACE") is the assignee of a joint venture ("JV") between Walsh Construction Company II, LLC and Alberici Constructors, Inc. (Doc. 1 at ¶ 1). As alleged in Plaintiff's Complaint, the United States Department of Veterans Affairs awarded the JV a contract to construct a medical clinic ("Clinic") at the Jefferson Barracks complex ("Jefferson Barracks") in St. Louis, Missouri. (*Id.* at ¶¶ 8-10). The JV purchased two AERCO Model B+II WaterWizard water heaters for installation at the Clinic. (*Id.* at ¶¶ 11-13). Defendant Blackmore & Glunt, Inc. ("B&G") delivered, inspected, and started up the water heaters on or about March 9, 2018. (*Id.* at ¶¶ 13, 15). DeLuca Plumbing, LLC, a subcontractor of the JV, installed the water heaters. (*Id.* at ¶ 14).

On June 16, 2018, at approximately 2:00 A.M., the JV's project manager received a call informing him that it was "raining inside the clinic." (*Id.* at ¶ 22). The manager discovered that an electronically controlled release valve on the AERCO water heater was discharging hot water, causing substantial damage to the property. (*Id.* at ¶¶ 23-24). After another malfunction a few months later, Defendants agreed to replace the defective heater under warranty. (*Id.* at ¶¶ 26-30). ACE, as insurer of the JV, paid out $3,999,770.92 for losses in connection with the June 26, 2018 flooding. ACE seeks this subrogated amount and other uninsured losses as assignee of the JV, and its Complaint includes the following counts: Product Liability (Count I); Negligence (Count II); Breach of Warranty (Count III).

## II.    LEGAL STANDARD

In deciding a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c), the Court "accept[s] all facts pled by the nonmoving party as true and draw[s] all reasonable inferences from the facts in favor of the nonmovant." *Waldron v. Boeing Co.*, 388 F.3d 591, 593 (8th Cir. 2004) (citations omitted). This is a "strict standard, as 'judgment on the pleadings is not properly granted unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'" *Unite Here Local 74 v. Pinnacle Entm't, Inc.*, No. 4:10-CV-00747 ERW, 2011 WL 65934, at *2 (E.D. Mo. Jan. 10, 2011) (quoting *United States v. Any and All Radio Station Transmission Equip.*, 207 F.3d 458, 462 (8th Cir. 2000)). Ultimately, a motion for judgment on the pleadings is governed by the same standard as a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See Clemmons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009).

### III.    DISCUSSION

This motion, concerning a hot water heater which allegedly malfunctioned in 2018, requires analysis of Missouri law in 1892 (or 1826, depending on which party you ask). AERCO seeks judgment on the pleadings pursuant to the federal enclave doctrine, which provides that "when an area in a State becomes a federal enclave, 'only the [state] law in effect at the time of the transfer of jurisdiction continues in force' as surrogate federal law." *Parker Drilling Mgm't Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019) (quoting *James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 100 (1940)). The doctrine stems from the federal government's power to exclusively regulate properties acquired from state governments. U.S. Const., Art. I, § 8, cl. 17 (the "Enclave Clause"). This Court must accordingly answer two questions. First, when, if ever, did Jefferson Barracks become a federal enclave? Second, were Plaintiff's claims against AERCO cognizable under Missouri law at such time?

### A.    Jefferson Barracks as a Federal Enclave

The parties do not dispute that Jefferson Barracks is a federal enclave; they just disagree over exactly when it became one. There are three requirements for the establishment of a federal enclave: (1) the United States acquires land in a state for one of the purposes mentioned in the Enclave Clause; (2) the state cedes exclusive jurisdiction to the federal government; and (3) the federal government accepts this grant of jurisdiction.[1] *Sultan v. 3M Co.*, 2020 WL 7055576, at *6 (D. Minn. Dec. 2, 2020), *appeal filed Forest Taylor v. 3M Co.*, No. 20-3642 (8th Cir. Dec. 21, 2020) (citing *Paul v. United States*, 371 U.S. 245, 264 (1963)).

---

[1] Because Missouri unquestionably ceded jurisdiction before 1940, it is presumed that the federal government accepted the grant of jurisdiction. *See State v. Smith*, 522 S.W.3d 221, 232 (Mo. banc 2017) (quoting *State ex rel. Laughlin v. Bowersox*, 318 S.W.3d 695, 698 (Mo. banc 2010)); *United States v. Heard*, 270 F. Supp. 198, 200 (W.D. Mo. 1967) ("Since the lands were acquired by the United States prior to February 1, 1940, acceptance of the jurisdiction by the United States is presumed.").

AERCO contends that these requirements were met as of 1826, when "1,702 acres of common ground in the village of Carondelet . . . was deeded from private landowners to the U.S. Government to establish a military post." U.S. Department of Veterans Affairs, Office of Historic Preservation, *Historic Context: St. Louis VA Medical Center – Jefferson Barracks Division* (Aug. 2012), *available at* http://www.stlouis.va.gov/news/VAMC-JB-HistoricContextFinal080712.pdf (last accessed Mar. 8, 2021).[2] Plaintiff argues that the deed for this property was not actually valid until 1854, and Missouri did not fully cede jurisdiction until 1892. In *City of St. Louis v. United States*, the United States Court of Claims thoroughly investigated the history of Jefferson Barracks. 9 Ct. Cl. 455 (1873). As the Missouri Supreme Court has noted, an "account of this transaction, while interesting to the student of history, is otherwise irrelevant." *Cockburn v. William*, 301 257 S.W. 458, 461 (Mo. banc 1923).

Essentially, a U.S. Army quartermaster obtained a quitclaim deed for Jefferson Barracks from twelve inhabitants of Carondelet in 1826. *City of St. Louis*, 9 Ct. Cl. at 460. The U.S. Army promptly erected Jefferson Barracks, but until 1854, the land remained subject to dispute between Carondelet and the federal government. *Id.* at 461. Finally, in 1854, the city council of Carondelet passed an ordinance "directing the mayor to execute a deed to the United States of the barracks

---

[2] The parties devote substantial discussion to whether the Court may take judicial notice of this document. (Docs. 18, 21, 31). This Court finds it relatively clear that it may take judicial notice of a report available on a federal government website and commissioned by the Department of Veterans Affairs. In *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016), the Eighth Circuit approvingly cited Seventh Circuit precedent recognizing "the authority of a court to take judicial notice of government websites." *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011). Courts in this circuit have routinely recognized that it is proper to take judicial notice of "sources whose accuracy cannot reasonably be questioned, *such as publications of official government agencies*." *Estate of Snyder v. Julian*, No. 1:11-CV-24 LMB, 2013 WL 4042195, at *13 (E.D. Mo. Aug. 8, 2013) (emphasis added); *see also Brakebill v. Jaeger*, 905 F.3d 553, 562 n.5 (8th Cir. 2018 (Kelly, J., dissenting) ("The district court properly took judicial notice of the state's official website.")). The Court takes notice that various other official government websites identify Jefferson Barracks as being used as an active federal military base since 1826. National Park Service, *Jefferson Barracks*, http://www.nps.gov/places/jefferson-barracks.htm (last accessed Mar. 8, 2021); U.S. Department of Veterans Affairs, National Cemetery Administration, *Jefferson Barracks National Cemetery*, http://www.cem.va.gov/cems/nchp/jeffersonbarracks.asp (last accessed Mar. 8, 2021). This decision does not prejudice Plaintiff, since the Court ultimately agrees that the federal enclave was not established until 1892.

tract" for nominal consideration. *Id.* at 463. The court in *City of St. Louis* confirmed the validity of this deed, a decision which was affirmed by the Supreme Court. *City of St. Louis v. United States*, 82 U.S. 462 (1875). As the Supreme Court noted, the 1854 deed was "based upon an equitable compromise of a long-pending and doubtful question of title." *Id.* at 467. This Court can hardly say that either a quitclaim deed given to the U.S. Army by twelve residents in 1824 or a city ordinance passed in 1856 served to oust Missouri of jurisdiction over a large swath of property in the state.[3] After all, the federal government acquires exclusive jurisdiction over a federal enclave "only with the consent of the state." *Osburn v. Morrison Knudsen Corp.*, 962 F. Supp. 1206, 1208 (E.D. Mo. 1997).

AERCO cites various Missouri statutes which expressly cede jurisdiction over land including Jefferson Barracks to the United States, but these statutes were not enacted until the twentieth century. *See* MO. REV. STAT. §§ 12.010; 12.020; 12.030; 12.040. The Court instead agrees with Plaintiff that 1892 is the earliest date at which it can be said that Missouri ceded exclusive jurisdiction over Jefferson Barracks. In 1892, Missouri's General Assembly passed a law explicitly providing that "exclusive jurisdiction . . . is hereby ceded to the United States over and within all territory within the limits of the military post and reservation of Jefferson Barracks." Laws of Missouri, 1892, Extra Session, 16. That this statute required passing further suggests that

---

[3]AERCO argues in reply that a state automatically cedes exclusive jurisdiction when the federal government operates land as a military post. Put another way, AERCO claims that the second test for application of the federal enclave doctrine becomes null when it comes to land used for military purposes. AERCO cites *Ft. Leavenworth R. Co. v. Lowe*, 114 U.S. 525 (1885), for this proposition. But AERCO fails to note that *Lowe* concerned land over which the Kansas legislature had formally ceded jurisdiction. *Id.* at 528; *see also Osburn v. Morrison Knudsen Corp.*, 962 F. Supp. 1206, 1208-09 (E.D. Mo. 1997) (relying on MO. REV. STAT. 12.040 to demonstrate that Missouri ceded jurisdiction over land used for military purposes); *Miller v. Wackenhut Servs., Inc.*, 808 F. Supp. 697, 699-700 (W.D. Mo. 1992) (same). Moreover, it is unclear whether the Clinic itself was consistently and exclusively utilized for military purposes from 1826 onward. *See id.* at 527 ("So far as that land constituting the reservation was not used for military purposes, the possession of the United States was only that of an individual proprietor."). As the Missouri Supreme Court has explained: "The United States Supreme Court has noted that a state must cede jurisdiction to the United States for the state to no longer have jurisdiction; it is not enough for the United States simply to purchase land within the state." *State ex rel. Laughlin v. Bowersox*, 318 S.W.3d 695, 699 (Mo. banc 2010).

Missouri had not yet ceded exclusive jurisdiction before 1892. Therefore, the operative question on this motion is whether Plaintiff's claims against AERCO are cognizable under Missouri law as it existed in 1892.[4]

B.  Plaintiff's Claims Under 1892 Missouri Law

The question before this Court is whether Missouri law in 1892 recognized claims for Product Liability (Count I), Negligence (Count II), and Breach of Warranty (Count III) against a remote product manufacturer with whom the plaintiff lacks privity.[5] Plaintiff effectively offers two theories of liability: first, AERCO can be held liable due to its relationship with Plaintiff. Second, AERCO can be held liable for the actions of B&G, its alleged agent.

**(1) Plaintiff's Relationship with AERCO**

Plaintiff's nominal relationship with AERCO, a remote product manufacturer, clearly cannot serve as the basis for liability under Missouri law in 1892. *Gordon v. Livingston* is instructive. 12 Mo.App. 267 (Mo.App. 1882). In *Gordon*, the plaintiff alleged that a City of St. Louis inspector erroneously classified a lot of wheat which was in fact of inferior grade. Upholding the trial court's judgment in favor of the defendant, the appellate court held that "[o]ne who sells

---

[4] The Court notes that this interpretation is consistent with opinion letters from the Office of the Attorney General of the State of Missouri. *See* Letter from B. Richard Creech, Assistant Attorney General, to Col. John J. Griffin, Chairman, Missouri Athletic Commission, *Fort Leonard Wood* (May 29, 1941) (citing 1892 statute as evidence that Missouri ceded exclusive jurisdiction over Jefferson Barracks but not Fort Leonard Wood), *available at* http://ago.mo.gov/docs/default-source/opinions/1941/035_1941_0529_Griffin.pdf (last accessed Mar. 8, 2021); Letter from Tyre W. Burton, Assistant Attorney General, to Honorable Ray J. Cunningham, Chief Attorney, Veterans Administration, *Taxation: Sales Tax: Jurisdiction of State of Missouri Government Over Government Property* (Apr. 26, 1938) (citing 1892 statute and finding Missouri could not impose state sales tax on items sold at Jefferson Barracks), *available at* http://ago.mo.gov/docs/default-source/opinions/1938/020_1938_0426_Cunningham.pdf (last accessed Mar. 8, 2021).

[5] AERCO acknowledges that the Congress has assimilated some state laws (typically criminal law) enacted after the creation of a federal enclave, but claims that there is no applicable federal statute for these counts. (Doc. 17 at 6). *See Allison v. Boeing Tech. Servs.*, 689 F.3d 1234, 1237 (10th Cir. 2012). There are also limited exceptions to the federal enclave doctrine, but none are applicable here. Plaintiff does not argue otherwise.

a defective article to be used for a particular purpose for which it is not fit, is not, in the absence

of fraud, liable for an injury caused to a third person by some defect in the construction of the

article." *Id.* at 273. Simply put, Missouri courts only recognized product and tort liability against

the direct seller as opposed to the original manufacturer. As the court explained in *Gordon*:

> There would be no bounds of actions and litigious intricacies, if the ill effects of
> the negligences of men could be followed down the chain of results to the final
> effect. Under such a doctrine, the careless manufacturer of iron might be held
> responsible for the destruction of a steamer by the bursting of a boiler, into which
> his imperfect material, after passing through many hands and various
> transformations, had been converted. *Id.* at 273 (quoting *Kahl v. Love*, 37 N.J.L. 5,
> 8 (N.J. 1874)).

There were certainly exceptions to this general principle, but almost exclusively where the

defendant had some non-contractual duty to the plaintiff. *See Roddy v. Missouri Pac. Ry. Co.* 15

S.W. 1112 (Mo. 1891). In *Gordon*, the court recognized potential liability for fraud and when there

exists a "duty which the law imposes to avoid acts in their nature dangerous to human life." *Id.* at

274. Plaintiff cites the Missouri Supreme Court's decision in *Heizer v. Kinglsand & Douglass Mfg.

Co.*, 19 S.W. 630 (1892), as evidence of such exceptions. But the court in *Heizer* explicitly held

that "[t]here being no privity of contract, the suit cannot be maintained." *Id.* at 632. It is especially

clear that claims for breach of warranty required privity of contract long after 1892. *See Sharp

Bros. Contracting Co. v. Am. Hoist & Derrick Co.*, 703 S.W.2d 901, 902 (Mo. banc 1986) (citing

that Missouri first permitted implied warranty claims without privity in 1963); *see also Dennis v.

Willys-Overland Motors, Inc.*, 111 F. Supp. 875, 875 (W.D. Mo. 1953) ("Where a consumer elects

to sue for breach of warranty the great majority of courts have held that there is no cause of action

if the parties are not in privity."); *Degouveia v. H.D. Lee Mercantile Co.*, 100 S.W.2d 336

(Mo.App. 1936) (holding there can be no liability for breach of express warranty where there is no privity of contract).[6]

The general rule under Missouri law in 1892 was that a plaintiff could not obtain judgment for products liability, negligence, or breach of warranty if they were not in privity with the defendant. The Court agrees with Plaintiff that there were various exceptions to this rule, including for dangerous products and in cases where some other relationship or statute established a duty (*e.g.*, public duties, landowner duties, railroad duties, etc.). *See Huset v. J.I. Case Threshing Mach. Co.*, 120 F. 865, 870-71 (8th Cir. 1904) (describing exceptions). There is simply no indication, however, that Missouri law imposed such duties on remote product manufacturers, or that the present case fits any of the exceptional circumstances recognized by Missouri courts. Instead, the courts consistently reference remote manufacturers as the quintessential example of a party which cannot be held liable. *See Heizer*, 19 S.W. at 632 ("It is true that defendants must have known, when it made and sold the machine to Ellis, that other persons would be engaged in operating it; but that is no reason why defendant should be held liable to such persons for injuries arising from the negligent use of poor material or for defective workmanship."). Therefore, Plaintiff's relationship with AERCO cannot serve as the basis for liability

---

[6] Plaintiff alleges that privity exists between the JV and AERCO, and requests leave to amend its Complaint to make the necessary allegations. But there is no genuine dispute of material fact on this issue – it is apparent, and Plaintiff does not deny, that its contract was with B&G, an authorized distributor of AERCO's products. Plaintiff states in response to the instant motion that the JV "purchased two Model B+II WaterWizard water heaters from defendant [B&G], AERCO's authorized distributor." (Doc. 22 at 2). Plaintiff has not alleged at any point that there exists a contract between the JV and AERCO.

The Missouri Supreme Court has clearly held that there is no privity of contract between a remote purchaser and manufacturer. *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 129 (Mo. banc 2010) ("Renaissance was not in privity with Great Plains – which sold the T1055 to Crush – but attempts to bring suit under the proposition that implied warranties extend to remote purchasers."). Plaintiff cites no precedent for the proposition that there is privity between a purchaser and manufacturer when a product is purchased from an authorized distributor.

**(2) AERCO's Relationship with B&G**

Plaintiff contends that AERCO can be held liable because "the complaint includes allegations based on misfeasance associated with the inspection and startup of the water heater by AERCO's authorized agent," B&G. (Doc. 22 at 9). Though it is not alleged clearly in the Complaint, Plaintiff now claims that B&G is an "authorized distributor and/or sales representative" of AERCO. (Doc. 22 at 8 n.4).

AERCO identifies two issues with Plaintiff's argument. First, AERCO argues that Missouri law in 1892 would not recognize the existence of an agency relationship between AERCO and B&G sufficient to establish AERCO's liability. In *Clark's Adm'x v. Hannibal & St. J.R. Co.*, the Missouri Supreme Court held that a general contractor could not be held liable "for the trespasses and injuries committed by the laborers and workmen employed in the construction of the road by the subcontractor." 36 Mo. 202, 217 (Mo. 1865). This was despite the fact that the general contractor's employee supervised the subcontractor's work, since after all the general contractor "had no immediate control over the men employed by the subcontractor." *Id.* at 219. There does not appear to be any material fact in dispute which would permit a finding that AERCO had more control over B&G and its employee than the general contractor had over its subcontractor in *Clark's Adm'x*.

Second, as of 1892, Missouri law also adopted the principle that an agent can only serve one master. "The principle of *respondeat superior*, in such case applies to the sub-contractor only; as between him and . . . his employees, the relation of master and servant exists and it ceases with him. There cannot be but one responsible master for the same servant, and where that relation cease, the liability ceases also." *Id.* at 218. The court in *Clark's Adm'x* approvingly cited *Blake v. Ferris*, which held that the "*immediate employer* of the agent or servant, through whose negligence

an injury occurs, is the person responsible for the negligence of such agent or servant." 5 N.Y. 48, 49 (N.Y. App. 1851). As applied to the facts at hand, it was B&G's employee, Dennis Hischke, who inspected and installed the water heaters.

The precedent cited by Plaintiff is not necessarily to the contrary. In *Eckert v. St. Louis Transfer Co.*, a Missouri court acknowledged that the "universally recognized rule is that the principal is civilly liable for neglect . . . of his agent *in the course of his employment*." 2 Mo.App. 36, 45 (Mo.App. 1876) (emphasis added); *see also Harriman v. Stowe*, 57 Mo. 93, 98 (Mo. 1874) ("The well settled principle of law is, that where an agent is employed to perform or superintend work, the principal is responsible to third persons for injuries caused by the neglect . . . of the agent in doing the work."). The ultimate test for agency under Missouri law in 1892 was "whether the defendant reserved *control* over him as to the manner of doing the work." *Fink v. Missouri Furnace Co.*, 10 Mo.App. 61, 66 (Mo.App. 1881).[7] Control necessarily requires "the power to *discharge*." *Id.*

This Court is particularly influenced by the Eighth Circuit's decision in *Huset v. J.I. Case Threshing Mach. Co.*, 120 F. 865 (8th Cir. 1903). The court noted the "general rule" that a manufacturer "is not liable to third parties who have no contractual relations with him for negligence in the construction, manufacture, or sale of the articles he handles." *Id.* at 867-68. Critically, the court specifically cited circumstances where a manufacturer "sells articles to the wholesale or retail dealers" as an example where the manufacturer becomes "insulate[d]" from liability. *Id.* at 867. Scholars have specifically described how "manufacturers increasingly were handing over the retail function to third-party dealers," thus making "available the ready-made

---

[7] Even under modern, expanded agency principles, courts have found that no agency relationship whatsoever existed between a manufacturer and its authorized distributor. *See, e.g.*, *Witt v. Clenendin Lumber*, 363 S.E.2d 749 (W.Va. 1987).

defense of no privity of contract, a defense that was proving its effectiveness in actions brought in negligence." David G. Owen, *The Evolution of Products Liability Law*, 26 REV. LITIG. 955, 962 (2007). While American law has properly departed from this extremely narrow construction of duty,[8] this Court is required to apply the law as it existed in 1892 pursuant to the federal enclave doctrine.

Plaintiff's Complaint provides virtually no evidence of the agency relationship between AERCO and B&G. Plaintiff requests leave to amend its Complaint to make the necessary allegations. (Doc. 22 at 8 n.4). This Court recognizes its obligation to "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Having said that, the Court also notes that it is Plaintiff's obligation to establish the existence of an agency relationship between AERCO and B&G, and agency "will not be inferred merely because a party assumed it existed." *Karr-Nick Kitchens & Bath, Inc. v. Gemini Coatings, Inc.*, 932 S.W.2d 877, 879 (Mo.App. 1996). At this early stage of litigation, this Court has very minimal information regarding the relationship between AERCO and B&G, nor has the Court been provided the actual contract for purchase of the water heaters. Because there is a genuine dispute as to the relationship between AERCO and B&G, the Court will provide Plaintiff an opportunity to amend its Complaint.

Even the establishment of an agency relationship, however, will not cure the defects in Counts I and III of Plaintiff's Complaint. Having reviewed applicable precedent prior to 1892, privity of contract was an essential requirement for claims of product liability and breach of warranty. There being no contract between Plaintiff and AERCO, Counts I and III fail as a matter of law. *Heizer*, 19 S.W. at 632.

---

[8] As one scholar has put it, "[M]ore than a million Americans – probably several million – live and work in places governed by long-discarded nineteenth-century precepts, jurisprudential purgatories where the revenants of long-dead legal doctrines stalk the living. We call these places federal enclaves." Chad DeVeaux, *Trapped in the Amber: State Common Law, Employee Rights, and Federal Enclaves*, 77 BROOK. L. REV. 499, 500 (2012).

## IV.     CONCLUSION

This Court faces the odd predicament of applying nineteenth century Missouri tort law principles to the relationship between AERCO, B&G, and Plaintiff. Plaintiff's lack of contractual privity with AERCO precludes any claim for product liability or breach of warranty under Missouri law as it existed in 1892. As to Plaintiff's negligence claim, this Court will grant Plaintiff an opportunity to amend its Complaint in order to sufficiently allege that B&G operated as an agent of AERCO when selling and starting up the water heaters. The Court notes that Plaintiff's negligence claim against AERCO may still fail as a matter of law depending on the nature of the agency relationship between AERCO and B&G, if any.

Accordingly,

**IT IS HEREBY ORDERED** that that Defendant AERCO's Motion for Judgment on the Pleadings (Doc. 16) is **GRANTED in part**. Counts I and III of Plaintiff's Complaint against AERCO are **DISMISSED with prejudice.**

**IT IS FURTHER ORDERED** that Plaintiff shall file an Amended Complaint within **fifteen (15) days** of this Memorandum and Order.

Dated this 8th day of March, 2021.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE